HENRY H. SHAVITZ, FOR HIMSELF AND OTHERS SIMILARLY SITUATED, PLAINTIFF v. CITY OF HIGH POINT, A MUNICIPAL CORPORATION, ELECTRONIC DATA SYSTEMS CORPORATION, A CORPORATION DOING BUSINESS IN NORTH CAROLINA, ALLEN L. PEARSON, II, PEEK TRAFFIC, INC., A CORPORATION DOING BUSINESS IN NORTH CAROLINA, PHIL WYLIE, SREEKANTH NANDAGIRI, ARNOLD KOONCE, MAYOR OF THE CITY OF HIGH POINT, ALBERT A. CAMPBELL, M. CHRISTOPHER WHITLEY, AARON M. CHRISTOPHER, RONALD B. WILKINS, M. C. ROWE, WILLIAM S. BENCINI, JR., DAVID B. WALL, EACH MEMBERS OF THE HIGH POINT CITY COUNCIL, STRIB BOYNTON, CITY MANAGER OF THE CITY OF HIGH POINT, AND THE GUILFORD COUNTY BOARD OF EDUCATION, DEFENDANTS

No. COA05-571

(Filed 16 May 2006)

1. Penalties, Fines, and Forefeitures— red light camera program—North Carolina Constitution Article IX, Section 7

The trial court did not err by ruling that Article IX, Section 7 of the North Carolina Constitution applies to defendant city's red light camera program, because: (1) if money is collected for the transgression of both a municipal ordinance and a coordinate state statute, then the penal laws of our state are implicated and Article IX, Section 7 controls the disposition of the funds; (2) our Supreme Court stated the nature of the offense committed and not the method employed by the municipality to collect fines for commission of the offense should be considered; and (3) the money collected under the city's ordinance serves to punish transgressions of both local and state penal laws when the red light cameras are an alternative means for capturing traffic control violations and the ultimate determination as to whether to issue a citation rests with a city police officer.

2. Penalties, Fines, and Forfeitures— red light camera program—amount of clear proceeds paid to Board of Education

The trial court did not err by allegedly miscalculating the amount of the clear proceeds to be paid to the Board of Education (BOE) under Article IX, Section 7 of the North Carolina Constitution arising out of collections for violations of a red light camera program and by concluding that defendant city must pay ninety percent of the amount collected by its red light camera program to the BOE, because: (1) although defendant city contends the portion of the penalties it paid to the company that installed and maintains the red light cameras, as well as the fee it paid to the appeal hearing officers, should be deducted to deter-

mine the clear proceeds of its red light camera program, these expenditures constitute enforcement costs rather than collection costs; (2) the city is bound by the definition of clear proceeds as set forth in N.C.G.S. § 115C-437; (3) the plain language of Article IX, Section 7 states that the clear proceeds of applicable penalties, fines, and forfeitures shall belong to and remain in the several counties, and shall be faithfully appropriated and used exclusively for maintaining free public schools; and (4) the statutory limitation on a municipality's ability to withhold collection costs, as codified by N.C.G.S. § 115C-437, comports with the language of Article IX, Section 7.

### 3. Interest— postjudgment—city—sovereign capacity

The trial court erred by awarding postjudgment interest in an action where defendant city sought to enforce its state and municipal traffic laws through its red light camera program and for management of the proceeds collected for violations, because: (1) N.C.G.S. § 24-5(b) does not operate against the state when interest may not be awarded against the state unless the state has manifested its willingness to pay interest by an Act of the General Assembly or by a lawful contract to do so; and (2) N.C.G.S. § 24-5(b) cannot be used against defendant city since it is a political subdivision of the state acting in its sovereign capacity.

Appeal by defendant City of High Point from judgments entered 22 December 2004 by Judge Lindsay R. Davis and 23 February 2005 by Judge A. Moses Massey in Guilford County Superior Court. Heard in the Court of Appeals 11 January 2006.

*Womble Carlyle Sandridge & Rice, PLLC, by Burley B. Mitchell, Jr., Sean E. Andrussier, and Gusti W. Frankel, for the City of High Point defendant appellant.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Robert J. King III, Jill R. Wilson, and Elizabeth V. LaFollette, for the Guilford County Board of Education defendant appellee.*

*General Counsel Andrew L. Romanet, Jr., Senior Assistant General Counsel Gregory F. Schwitzgebel III, and Senior Assistant City Attorney for the City of Charlotte Robert Hagemann, for the North Carolina League of Municipalities, amicus curiae.*

*Tharrington Smith, L.L.P., by Michael Crowell and Deborah Stagner; and Allison Schafer for the North Carolina School Boards Association, amicus curiae.*

McCULLOUGH, Judge.

Article IX, Section 7 of the North Carolina Constitution provides that "the clear proceeds of all penalties and forfeitures and of all fines collected in the several counties for any breach of the penal laws of the state, shall belong to and remain in the several counties, and shall be faithfully appropriated and used exclusively for maintaining free public schools." N.C. Const. art. IX, § 7 (2003), *amended by* 2003 N.C. Sess. Laws ch. 423, § 1 (effective Jan. 1, 2005).[1] The present appeal requires us to determine whether this constitutional provision applies to penalties collected by the City of High Point under its red light camera program.

On motions for summary judgment, the superior court ruled that the Constitution was applicable to the program and that the ordinance failed to dispose of red light camera penalties in accordance with constitutional mandate, and ordered High Point to pay ninety percent of the penalties collected under the program to the Guilford County Board of Education. For the reasons set forth herein, we uphold these rulings of the superior court.

The present case also raises an issue as to whether High Point should have been ordered to pay post-judgment interest. We conclude that the general statutory provision governing post-judgment interest is not applicable to the City and vacate the portion of the superior court's order requiring High Point to pay interest.

Background

Since the enactment of Chapter 583, Section 2 of the 1949 North Carolina Session Laws, section 20-158 of our General Statutes have prohibited motorists from entering an intersection while a stoplight is emitting a red light. *See* N.C. Gen. Stat. § 20-158(b)(2) (2003), *amended by* 2004 N.C. Sess. Laws ch. 141, §§ 1, 2 and ch. 172, § 2. Under the General Statutes, failure to stop for a red stoplight is an infraction, and a violator "may be ordered to pay a penalty of not more than one hundred dollars." N.C. Gen. Stat. § 20-176(a), (b) (2005).

---

1. The amendment added a subsection (b) to Article IX, Section 7, which is not at issue in the instant case.

Beginning in 1997, certain specified municipalities were legislatively imbued with the authority to "adopt ordinances for the civil enforcement of [section] 20-158 [of the General Statutes] by means of a traffic control photographic system," or as such systems are referred to in the vernacular, "red light cameras." N.C. Gen. Stat. § 160A-300.1(c) (2005), *enacted by* 1997 N.C. Sess. Laws ch. 216, §§ 1, 2; *see also id.* § 160A-300.1(a) (providing a technical definition for "traffic control photographic system"). The enabling legislation, section 160A-300.1(c), provides that, "[n]otwithstanding the provisions of [section] 20-176 [of the General Statutes], in the event that a municipality adopts [a red light camera] ordinance . . . , a violation of [section] 20-158 at a location at which a traffic control photographic system is in operation shall not be an infraction." *Id.* § 160A-300.1(c). The statute further requires red light camera ordinances to contain language to the following effect:

(2) A violation detected by a traffic control photographic system shall be deemed a noncriminal violation for which a civil penalty of fifty dollars ($50.00) shall be assessed, and for which no points authorized by [section] 20-16(c) [of the General Statutes] shall be assigned to the owner or driver of the vehicle nor insurance points as authorized by [section] 58-36-65 [of the General Statutes].

(3) The owner of the vehicle shall be issued a citation which shall clearly state the manner in which the violation may be challenged, and the owner shall comply with the directions on the citation. The citation shall be processed by officials or agents of the municipality and shall be forwarded by personal service or first-class mail to the address given on the motor vehicle registration. If the owner fails to pay the civil penalty or to respond to the citation within the time period specified on the citation, the owner shall have waived the right to contest responsibility for the violation, and shall be subject to a civil penalty not to exceed one hundred dollars ($100.00). The municipality may establish procedures for the collection of these penalties and may enforce the penalties by civil action in the nature of debt.

(4) The municipality shall institute a nonjudicial administrative hearing to review objections to citations or penalties issued or assessed under this section.

*Id.* § 160A-300.1(c)(2), (3), (4). In 1999, the City of High Point was granted the authority to enact a red light camera ordinance. *See id.* § 160A-300.1(d), *as amended by* 1999 N.C. Sess. Laws ch. 181, § 2.

Shortly thereafter, High Point enacted section 10-1-306 of its Code of Ordinances, which provided as follows:

(a) *Administration.* The City of High Point shall implement a system for capturing traffic control violations, as defined under [section] 20-158 [of the General Statutes], with a traffic control photographic system that will use the photographic images as prima facie evidence of the traffic violations and will authorize the High Point Department of Transportation or an agent of the department to issue civil citations.

The City of High Point Department of Transportation shall administer the traffic control photographic program and shall maintain a list of system locations where traffic control photographic systems are installed.

Any citation for a violation for [section] 20-158 [of the General Statutes] or other traffic violation, issued by a duly authorized law enforcement officer at a system location shall be treated, pursuant to [section] 20-176 [of the General Statutes], as an infraction so long as the system photographic images are not used as prima facie evidence of the violation.

The citation shall clearly state the manner in which the violation may be reviewed. The citation shall be processed by officials or agents of the city and shall be forwarded by personal service or first-class mail to the owner's address as given on the motor vehicle registration.

(b) *Offense*

(1) It shall be unlawful for a vehicle to cross the stop line at a system location when the traffic signal for that vehicle's direction of travel is emitting a steady red light, or for a vehicle to violate any other traffic regulation specified in [section] 20-158 [of the General Statutes].

(2) The owner of a vehicle shall be responsible for a violation under this section, unless the owner can furnish evidence that the vehicle was in the care, custody or control of another person at the time of the violation . . . .

* * * *

(c) *Penalty.* Any violation of this section shall be deemed a non-criminal violation for which a civil penalty of $50.00 shall be

assessed, and for which no points authorized by [section] 20-16(c) [of the General Statutes] shall be assigned to the owner or driver of the vehicle, nor insurance points as authorized by [section] 58-36[-]65 [of the General Statutes]. Failure to pay the civil penalty or to respond to the citation within 21 days shall constitute a waiver of the right to contest responsibility for the violation and shall subject the owner to a civil penalty not to exceed $100.00. The city shall establish procedures for the collection of the civil penalties and shall enforce the penalties by a civil action in the nature of a debt.

(d) *Nonjudicial administrative hearing.* The City of High Point Department of Transportation shall establish an administrati[ve] process to review objections to citations or penalties issued or assessed. A notice requesting a hearing to review objections shall be filed within 21 days after notification of the violation. An individual desiring a nonjudicial hearing must post a bond in the amount of $50.00 before a hearing will be scheduled. The determination of the hearing officer will be final.

HIGH POINT, N.C., CODE OF ORDINANCES § 10-1-306 (2001), *amended by* HIGH POINT, N.C., ORDINANCE NO. 01-68, § 1 (Aug. 16, 2001), No. 6071/03-45, § 1 (Aug. 21, 2003), and No. 6074/03-48, § 1 (Sept. 2, 2003).

In implementing this ordinance, High Point entered into a contract with Peek Traffic, Inc., pursuant to which Peek was to install red light cameras at several of the City's intersections. Peek also agreed to, *inter alia*, collect the photographs from the cameras and prepare potential citations. Peek entered into a subcontract with Electronic Data Systems Corporation (EDS) pursuant to which EDS was to perform some of Peek's contractual duties to High Point.

Under its contract with Peek, EDS reviewed the red light camera photographs for potential violations. EDS eliminated from consideration for a citation those photographs which demonstrated an obvious legitimate explanation for the motorist's behavior, such as a lawful right turn at a red light, and those photographs which failed to contain a legible image of the offending vehicle's license plate. For the remaining photographs, EDS identified the registered owner of the pictured vehicle and printed a "candidate" citation for the pictured violation. A police officer employed by the City of High Point then reviewed each candidate citation and made a determination as to whether an official citation should be issued. EDS then mailed the

SHAVITZ v. CITY OF HIGH POINT

[177 N.C. App. 465 (2006)]

approved citations to the owners of the vehicles appearing in the corresponding photographs.

The citation received by each unhappy motorist contained, *inter alia*, reproductions of the images captured by the red light camera, a record of the date and time that the images were taken, and the following statement: "The civil penalty for this violation is $50.00. . . . Failure to pay the civil penalty or respond to the citation within 21 days of notification will result in the automatic waiver of right to appeal and will result in an additional late penalty of $50.00." The back of the citation contained the following notice:

> If you wish to contest this citation, fill out the Appeal section and return this form along with a deposit of $50.00, which shall constitute a bond. Once your appeal is received, you will be contacted so that an administrative hearing can be scheduled. An independent hearing officer will hear your appeal.
>
> . . . If your citation is dismissed, your deposit will be refunded.

A space for registering the reasons for an appeal was included.

Appeals from red light camera citations were heard by one of two High Point University professors who agreed to serve as appeal hearing officers. These appeal hearing officers were compensated at a rate of $25.00 per hearing, regardless of the decision rendered.

High Point placed the money collected in connection with the red light camera citations in the "Red Light Camera Campaign Penalties Fund," which is separate from the City's general operating fund. Pursuant to its contractual obligations, High Point dispersed seventy percent of the revenue in the Red Light Camera Campaign Penalties Fund to pay Peek for the installation and operation of the red light camera system; this expense amounted to $35 of each $50 ticket. Monies from the fund were also used to compensate the appeal hearing officers, and a small amount was expended from the Fund to educate the public about the red light camera system. The remaining balance, if any, was dedicated for traffic safety programs and for safety-related transportation improvements.

### The Facts and Procedural History of the Present Case

On 4 April 2001, a red light camera recorded Henry H. Shavitz failing to observe a red stoplight at the intersection of Main and College Streets in High Point. On 3 May 2001, a citation was issued to Shavitz

in accordance with High Point's red light camera ordinance. Shavitz refused to pay the $50.00 fine in the prescribed twenty-one day period, and on 25 May 2001, he was issued a citation for $100.00, which included the cost of the red light violation and the penalty for failing to timely pay or appeal the original citation.

Shavitz responded by filing a lawsuit in Guilford County Superior Court against the City of High Point, its mayor, city manager, and city council members, the Guilford County Board of Education, Peek, and EDS. Shavitz' complaint sought declarations that section 160A-300.1 of the General Statutes and section 10-1-306 of the High Point City Code of Ordinances were repugnant to the North Carolina Constitution; that the contracts between High Point, Peek and EDS were illegal; that the penalties collected constituted an illegal tax; and that statutory section 160A-300.1 and ordinance section 10-1-306 and the contracts entered into between High Point, Peek, and EDS established a scheme which violated the equal protection and due process guarantees of the United States Constitution and the "law of the land" clause of the North Carolina Constitution. Shavitz' complaint further sought, as an alternative basis for relief in the event that the superior court found that the red light camera program was valid, a declaration that Article IX, Section 7 of the North Carolina Constitution required High Point to pay the clear proceeds of all past and present fines collected by the red light camera program to the Guilford County Board of Education.

The action was removed to the Federal District Court for the Middle District of North Carolina. While the action was pending in federal court, the Guilford County Board of Education filed an answer to Shavitz' lawsuit and a request for declaratory judgment that it was entitled to the clear proceeds of the red light camera fines pursuant to Article IX, Section 7 of the North Carolina Constitution.

On cross motions for summary judgment filed by a number of the parties, the district court ruled against Shavitz on all federal-law claims and certain state law claims and remanded to state court all but one of Shavitz' state-law claims. *Shavitz v. City of High Point*, 270 F. Supp. 2d 702 (M.D.N.C. 2003), *vacated in part sub nom.*, *Shavitz v. Guilford County Bd. of Educ.*, 100 Fed. Appx. 146 (4th Cir. 2004). The court retained Shavitz' claim under Article IX, Section 7 of the North Carolina Constitution and ruled that High Point did not owe the clear proceeds of its red light camera penalties to the Guilford County Board of Education. *Id.* at 729-30. On an appeal by the Board of Education, the United States Court of Appeals for the Fourth

Circuit issued an unpublished, *per curiam* opinion vacating the district court's ruling as to Article IX, Section 7 and instructing the district court to remand that claim to state court. *Shavitz v. Guilford County Bd. of Educ.*, 100 Fed. Appx. at 151-52.

Once the matter was remanded to the superior court, Shavitz voluntarily dismissed all of his claims. There remained, however, a dispute between High Point and the Board of Education concerning whether the Board was entitled to the clear proceeds of the penalties collected by the red light camera program. *See Jennette Fruit v. Seafare Corp.*, 75 N.C. App. 478, 483, 331 S.E.2d 305, 308 (1985) ("[U]nless a crossclaim is dependent upon plaintiff's original claim (as would be, *e.g.*, a crossclaim for indemnity or contribution) or is purely defensive, a plaintiff's dismissal of its claims against all defendants does not require dismissal of crossclaims properly filed in the same action."). Both High Point and the Board of Education moved for summary judgment on this issue.

The superior court ruled that Article IX, Section 7 of the North Carolina Constitution was applicable to High Point's red light camera program and that it required the clear proceeds of the penalties collected thereunder to be paid the Board of Education. Thereafter, the superior court entered a judgment awarding to the School Board

> 90% of all amounts collected by or on behalf of the City from the inception of [the red light camera program] through its termination, such amount to include $1,453,703.40 through December 21, 2004, and 90% of all amounts collected thereafter, less any amounts returned by or on behalf of the City to drivers who successfully appeal their penalties.

High Point was further ordered to pay post-judgment interest pursuant to section 24-5 of the General Statutes.

High Point now appeals to this Court, contending that the superior court erred by (1) ruling that Article IX, Section 7 of the North Carolina Constitution applies to its red light camera program, (2) miscalculating the amount of the clear proceeds to be paid to the Board under this provision if it is applicable, and (3) awarding post-judgment interest.

### The Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any ma-

terial fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2005). On a motion for summary judgment, "[t]he evidence is to be viewed in the light most favorable to the nonmoving party." *Moore v. Coachmen Industries, Inc.*, 129 N.C. App. 389, 394, 499 S.E.2d 772, 775 (1998). When determining whether the trial court properly ruled on a motion for summary judgment, this Court conducts a *de novo* review. *Va. Electric and Power Co. v. Tillett*, 80 N.C. App. 383, 385, 343 S.E.2d 188, 191, *cert. denied*, 317 N.C. 715, 347 S.E.2d 457 (1986). There is no dispute as to the facts in the instant case; therefore, our analysis is confined to issues of law.

## Discussion of the Issues

### I. The applicability of Article IX, Section 7 of the North Carolina Constitution to High Point's Red Light Camera Program

**[1]** Article IX, Section 7 controls the disposition of "penalties" and "fines" which are imposed for "breach[es] of the penal laws of the State." High Point contends that it has not imposed the type of penalty which falls under the ambit of this constitutional provision. We disagree.

Our Supreme Court has defined a penalty to be a sum collected under a "penal law[]," or a "law[] that impose[s] a monetary payment for [its] violation [where] [t]he payment is punitive rather than remedial in nature and is intended to penalize the wrongdoer rather than compensate a particular party." *Mussallam v. Mussallam*, 321 N.C. 504, 509, 364 S.E.2d 364, 366-67, *reh'g denied*, 322 N.C. 116, 367 S.E.2d 915 (1988). In the technical sense, "[a] 'fine' is the sentence pronounced by the court for a violation of the criminal law . . . ." *Board of Education v. Henderson*, 126 N.C. 689, 691, 36 S.E. 158, 159 (1900).

Our courts do not employ an "unduly restrictive" test to differentiate between fines and penalties:

> The heart of th[e] . . . distinction lies not in whether the monies are *denominated* "fines" or "penalties." [T]he label attached to the money does not control. Neither does the heart of the distinction rest in whether there has been an actual criminal prosecution resulting in a "sentence pronounced by the court." The crux of the distinction lies in the *nature* of the *offense* committed, and not in the *method* employed by the municipality to collect fines for commission of the offense.

*Cauble v. Asheville*, 301 N.C. 340, 344, 271 S.E.2d 258, 260 (1980) (*"Cauble II"*) (citations omitted), *aff'g in part and rev'g in part*, 45 N.C. App. 152, 263 S.E.2d 8 (1980) (*"Cauble I"*). Thus, an assessment is a penalty or a fine if it is "imposed to deter future violations and to extract retribution from the violator" for his illegal behavior. *N.C. School Bds. Ass'n v. Moore*, 359 N.C. 474, 496, 614 S.E.2d 504, 517 (2005).

In large measure, High Point's argument to this Court is premised upon our Supreme Court's early Twentieth Century opinion in *Board of Education v. Henderson*, 126 N.C. [439] 689, 36 S.E. 158 (1900). In the *Henderson* case, the Vance County Board of Education sued the Town of Henderson seeking the proceeds of fines and penalties collected by the Town. *Id.* at 690-91, 36 S.E. at 158-59. In a decision predating the Court's subsequent declaration that no restrictive test should be employed to differentiate fines and penalties, the justices noted that

> [a] municipal corporation has the right, by means of its corporate legislation, commonly called town ordinances, to create offenses, and fix penalties for the violation of its ordinances, and may enforce these penalties by civil action; but it has no right to create criminal offenses. And this being so, it was found to be almost impossible to administer and enforce a proper police government in towns and cities by means of penalties alone. It therefore became necessary to make the violation of town ordinances . . .— a criminal offense—which was done by [section 14-4 of the General Statutes].

*Id.* at 691, 36 S.E. at 159. The Supreme Court drew a now somewhat outdated distinction between fines and penalties, and issued the following ruling:

> [A]ll the fines the [Town] has collected upon prosecutions for violations of the *criminal laws* of the State, whether for violations of *its ordinances* made criminal by section [14-4 of the General Statutes], or by other criminal statutes, such fines belong to the common school fund of the county. It is thus appropriated by the Constitution, and it can not be diverted or withheld from this fund without violating the Constitution. This is not so with regard to "penalties" which the [Town] may have sued for and collected out of offenders violating its ordinances. These are not penalties collected for the *violation of a law of the State*, but of a town ordinance. But wherever there was a fine imposed in a State pros-

ecution for a misdemeanor under section [14-4] of the [General Statutes], it belongs to the school fund, and, as we have said, must go to that fund.

*Id.* at 692, 36 S.E. at 159; *see also School Directors v. Asheville*, 137 N.C. 503, 508-09, 50 S.E. 279, 281 (1905) ("It is settled that the Legislature may give to cities and towns the entire penalty incurred for the violation of ordinances to be recovered in a civil action, but when the State interposes and declares the violation of an ordinance a misdemeanor, the fine imposed for the criminal offense must go in the way directed by the Constitution.").

Eighty years after *Henderson*, the Supreme Court decided *Cauble II*, 301 N.C. 340, 271 S.E.2d 258 (1980). The *Cauble II* case involved a suit by citizens seeking to have the proceeds of the penalties imposed by the City of Asheville for overtime parking given to the public schools in accordance with Article IX, Section 7. After indicating that an "unduly restrictive" test should not be utilized to distinguish between penalties and fines, *id.* at 344, 271 S.E.2d at 260, the Court issued the following holding:

The Asheville Code makes it unlawful to park overtime. [Section] 14-4 [of the General Statutes] specifically makes criminal the violation of a city ordinance, unless "the council shall provide otherwise" . . . . Thus, where, as here, the ordinances do not provide otherwise, a person who violates the overtime parking ordinance also breaches the penal law of the State. Consequently, fines collected for overtime parking constitute fines collected for a breach of the penal laws of the State. We, therefore, hold that the clear proceeds of all penalties, forfeitures and fines collected for breaches of the ordinances in question remain in Buncombe County and be used exclusively for the maintenance of free public schools.

*Id.* at 345, 271 S.E.2d at 261.

For the sake of clarity, we note that, in the *Henderson* and *Cauble* cases, section 14-4 of the General Statutes was the "penal law[] of the State" which triggered the operation of the Constitution. Pursuant to section 14-4, a person commits a misdemeanor if he "violate[s] an ordinance of a . . . city . . . sewerage district" and commits an infraction if he "violate[s] an ordinance of a . . . city . . . regulating the operation or parking of vehicles." N.C. Gen. Stat. §§ 14-4(a), (b) (2005). Unless a municipality provides otherwise, the

violation of a city ordinance is a misdemeanor or infraction as provided by [section] 14-4. An ordinance may provide by express statement that the maximum fine, term of imprisonment, or infraction penalty to be imposed for a violation is some amount of money or number of days less than the maximum imposed by [section] 14-4.

N.C. Gen. Stat. § 160A-175(b) (2005).

In 2002, this Court decided the case of *Donoho v. City of Asheville,* 153 N.C. App. 110, 569 S.E.2d 19 (2002), *disc. reviews denied and cert. denied,* 356 N.C. 669, 576 S.E.2d 110 (2003). The *Donoho* case involved penalties under a local air pollution control program. The local program used penalties to enforce state environmental laws. *Id.* at 113-15, 569 S.E.2d at 21-22. When environmental laws were enforced by penalties imposed by the North Carolina Department of Environment and Natural Resources, the proceeds of the penalties were disposed of in accordance with Article IX, Section 7. *Id.* at 113, 569 S.E.2d at 21. However, when penalties were imposed under the local program, the proceeds were not given to the public schools. *Id.* at 115, 569 S.E.2d 22. This Court ruled that Article IX, Section 7 applied to the penalties assessed by the local program:

> It would be anomalous for violations of state-mandated air quality standards to result in civil penalties allocated to local school boards in all counties where the Commission enforces the state air pollution laws but a similar violation in the counties with local programs approved by the Commission experienced a different result. If such were the case, every county and local governmental unit could circumvent the state constitution by setting up a local air quality enforcement unit pursuant to state-delegated authority, and thereby develop a new revenue stream, while depriving the schools of funds directed to them by Article IX, Section 7 of the North Carolina Constitution.

*Id.* at 118, 569 S.E.2d at 24.

Finally, in 2005, our Supreme Court decided *North Carolina School Boards Association v. Moore,* 359 N.C. 474, 614 S.E.2d 504 (2005). *Moore* involved the applicability of Article IX, Section 7 to monies collected by the University of North Carolina campuses for violations of vehicle registration, traffic, and parking ordinances adopted by the board of trustees of the state's university system. *Id.* at 494, 614 S.E.2d at 516. The General Assembly authorized the board

of trustees to provide that the violation of one of its ordinances would " 'subject[] the offender to a civil penalty' " to be collected " 'by civil action in the nature of debt.' " *Id.* (quoting N.C. Gen. Stat. § 116-44.4(h) (2003)). If the system did not provide for such a penalty, then ordinance violations were nevertheless infractions punishable by a monetary penalty under section 116-44.4(g) of the General Statutes. *Id.* The university system did provide for the imposition of its own civil penalties and argued that "the payments collected [thereunder] by the constituent institutions for violation of parking, traffic, and vehicle registration ordinances [were] not civil penalties collected for a breach of the State's penal laws." *Id.* at 495, 614 S.E.2d at 517. In an analysis that mostly concerned the penal nature of the assessments at issue, the Supreme Court held that Article IX, Section 7 controlled the disposition of the funds. *Id.* at 497, 614 S.E.2d at 518.

The foregoing authorities establish, at the very least, that if money is collected for the transgression of both a municipal ordinance and a coordinate state statute, then the penal laws of our state are implicated and Article IX, Section 7 controls the disposition of the funds. Thus, in the instant case, the Constitution applies to the High Point red light camera program if the program exacts penalties for violations of the City's red light camera ordinance and also exacts penalties to enforce the penal laws of our state.

It is uncontested that the failure to observe a red stoplight is illegal by virtue of section 20-158(b)(2) of the General Statutes. Generally, section 20-158(b)(2) is enforced by statutory section 20-176(b), which makes a violation an infraction, punishable by a fine. When this method of enforcement is employed, section 20-158 is clearly a penal law of the state. *See ante*, slip op. at 13-14, —— N.C. App. at ——, —— S.E.2d at —— (discussing what constitutes a penal law); David M. Lawrence, *Fines Penalties, and Forfeitures: An Historical and Comparative Analysis*, 65 N.C.L. Rev. 49, 81 (1986) ("A law that is enforced as an infraction is clearly a penal law. A monetary payment is imposed upon proof of its violation, and the penalty is clearly intended to be punitive rather than compensatory.").

Section 160A-300.1, which authorizes municipal red light camera programs, merely creates an alternative mechanism for enforcement of section 20-158(b)(2). Specifically, section 160A-300.1 delegates enforcement to municipalities, and decriminalizes violations of section 20-158(b)(2) by providing that "[n]otwithstanding the provisions

of [section] 20-176, in the event that a municipality adopts [a red light camera] ordinance . . . , a violation of [section] 20-158 shall not be an infraction" and by making red light camera violations "noncriminal violation[s] for which a civil penalty of fifty dollars ($50.00) shall be assessed." N.C. Gen. Stat. §§ 160A-300.1(c), (c)(2).

High Point Ordinance 10-1-306 establishes the red light camera program authorized by section 160A-300.1 of the General Statutes. High Point's ordinance implements a system for "capturing traffic control violations, as defined under [section] 20-158 [of the General Statutes]" with red light cameras, "us[ing] the photographic images as prima facie evidence of traffic violations," and having "the High Point Department of Transportation or an agent . . . issue civil citations" based on the photographs. HIGH POINT, N.C., CODE OF ORDINANCES § 10-1-306(a).

If a motorist fails to observe a red stoplight at an intersection at which High Point has placed a red light camera, that motorist undoubtedly has violated section 20-158(b)(2) of the General Statutes. If High Point punishes that motorist by imposing the civil penalty established by its red light camera ordinance, then High Point is enforcing a penal law of the state because the City is acting under the authority of section 160A-300.1 of the General Statutes, which provides for municipal civil enforcement of section 20-158. To hold otherwise would be to permit High Point to "circumvent the state constitution by setting up a local [penalty program] pursuant to state-delegated authority, and thereby develop a new revenue stream, while depriving the schools of funds directed to them by Article IX, Section 7 of the North Carolina Constitution." *Donoho*, 153 N.C. App. at 118, 569 S.E.2d at 24. Further, the fact that the violation results in a civil penalty rather than a fine for an infraction is irrelevant if we are to observe the Supreme Court's admonition to consider "the *nature* of the *offense* committed, and not . . . the *method* employed by the municipality to collect fines for commission of the offense." *Cauble II*, 301 N.C. at 344, 271 S.E.2d at 260. Whether red light violations are punished as infractions or by the assessment of civil penalties by High Point, monetary payments are nevertheless "imposed [ ] to deter future violations and to extract retribution from the violator" for a transgression of section 20-158 of the General Statutes. *Moore*, 359 N.C. at 496, 614 S.E.2d at 517.

It is immaterial that High Point's ordinance also makes running a red stoplight illegal by providing that

[i]t shall be unlawful for a vehicle to cross the stop line at a system location when the traffic signal for that vehicle's direction of travel is emitting a steady red light, or for a vehicle to violate any other traffic regulation specified in [section] 20-158 [of the General Statutes].

HIGH POINT, N.C., CODE OF ORDINANCES § 10-1-306(b)(1). As the ordinance provision tacitly indicates, the violation it creates already exists by virtue of section 20-158. Accordingly, the money collected under the ordinance serves to punish transgressions of both local and state penal laws.

Our analysis is borne out by the uncontested evidence that High Point's enforcement of what it now alleges is an entirely municipal program remains largely unsegregated from the City's enforcement of state penal law. High Point's red light camera ordinance includes a provision for traditional enforcement:

Any citation for a violation of [section] 20-158 [of the General Statutes] . . . issued by a duly authorized law enforcement officer at a [red light camera] system location shall be treated . . . as an infraction so long as the system photographic images are not used as prima facie evidence of the violation.

HIGH POINT, N.C., CODE OF ORDINANCES § 10-1-306(a). By the terms of the ordinance, the red light cameras are an alternative means for "capturing traffic control violations, as defined under [section] 20-158 [of the General Statutes]." Id. § 10-1-306(a). In both cases, the ultimate determination as to whether to issue a citation rests with a city police officer, who determines whether there has been a violation of section 20-158 of the General Statutes. Ante, slip op. at 7, —— N.C. App. at ——, —— S.E.2d at ——.

Finally, we note that there is no merit in High Point's argument that the penalties it collects do not accrue to the state. The reach of Article IX, Section 7 is limited to that portion of a penalty which accrues to the state; however, this mostly historical limitation has been construed to exempt only that portion of a penalty which is due a private citizen who has brought a private action to enforce state law, also known as a qui tam action. See Donoho, 153 N.C. App. at 117, 569 S.E.2d at 23 ("Several cases have held that the phrase 'accrue to the State' should be taken in the context in which it was developed—as opposed to being payable to a private party."); Lawrence, supra, 65 N.C.L. REV. at 70 (noting that the phrase "accrue to the State" is to be contrasted with funds collected in a qui tam action).

Accordingly, we hold that Article IX, Section 7 applies to the civil penalties assessed by High Point under its red light camera ordinance. The superior court's ruling to this effect must be affirmed.

II. The Amount of the "Clear Proceeds" Owed to the Board of Education Under Article IX, Section 7

[2] Article IX, Section 7 requires that the "clear proceeds" of all penalties, fines and forfeitures be "appropriated and used exclusively for maintaining free public schools." N.C. Const. Art. IX, § 7. "[T]he term 'clear proceeds' as used in Article IX, Section 7 is synonymous with net proceeds[,] . . . and . . . the costs of collection should be deducted from the gross proceeds of monies received for traffic violations in order to determine the net or 'clear proceeds.' " *Cauble v. Asheville*, 314 N.C. 598, 604, 336 S.E.2d 59, 63 (1985) ("*Cauble IV*"), *aff'g* 66 N.C. App. 537, 311 S.E.2d 889 (1984) ("*Cauble III*").

Our Supreme Court has characterized its cases interpreting the phrase "clear proceeds" as follows:

> In [*State v.*] *Maultsby* the Court stated that "[b]y 'clear proceeds' is meant the total sum *less only the sheriff's fees for collection, when the fine and cost[s] are collected in full.*" 139 N.C. [583, 585], 51 S.E. 956 [(1905)] (emphasis added). In *Hightower* [*v. Thompson*] the Court stated that "the 'clear proceeds' have been judicially defined as the amount of the forfeit *less the cost of collection, meaning thereby the citations and process against the bondsman usual in the practice.*" 231 N.C. 493-94, 57 S.E.2d 765 [1950] [emphasis added]. In *School Directors v. Asheville*, we emphasize the language "that the power of the Legislature is exhausted by giving to the clerk or sheriff a reasonable commission for collecting the fines—to be deducted from the amount before paying it over to the treasurer of the school fund." 137 N.C. at 511-12, 50 S.E. at 282.

*Cauble IV*, 314 N.C. at 605-06, 336 S.E.2d at 64. According to the Court,

> these cases indicate that the costs of collection do not include the costs associated with enforcing the ordinance but are limited to the administrative costs of collecting the funds. If . . . the costs of enforcing the penal laws of the State were a part of collection of fines imposed by the laws, there could never by any *clear proceeds* of such fines to be used for the support of the public schools. This would in itself contravene that portion of Article IX,

Section 7 of the North Carolina Constitution which directs that clear proceeds of penalties, forfeitures and fines collected for any breach of the penal laws of the State shall be applied to the public schools. We do not believe that the framers of our Constitution intended such a result. Conversely it would be an impractical and harsh rule to deny municipalities the reasonable costs of collections.

*Id.* at 606, 336 S.E.2d at 64.

Article IX, Section 7 "is not self-executing"; therefore, the General Assembly may "specify[] how the provision's goals are to be implemented." *Moore*, 359 N.C. at 512, 614 S.E.2d at 527; *see also* Lawrence, *supra*, 65 N.C.L. REV. at 74 ("[I]t is implicit in the North Carolina cases and consistently upheld in other states [with a constitutional provision comparable to Article IX, Section 7] that the general assembly does have the power to define those collection related costs that are deductible."). In exercise of this authority, the Legislature has enacted section 115C-437 of the General Statutes:

The clear proceeds of all penalties and forfeitures and of all fines collected for any breach of the penal laws of the State, as referred to in Article IX, Sec[tion] 7 of the Constitution, shall include the full amount of all penalties, forfeitures or fines collected under authority conferred by the State, diminished only by the actual costs of collection, not to exceed ten percent (10%) of the amount collected.

N.C. Gen. Stat. § 115C-437 (2005).

High Point argues that the portion of the penalties it paid to Peek and the fees it paid to the appeal hearing officers should be deducted to determine the "clear proceeds" of its red light camera program. This assertion is nonsensical, as these expenditures clearly constitute enforcement costs rather than collection costs. The payments to Peek accomplish enforcement of the traffic laws in much the same way as paying police officers for traditional enforcement, and the payment of the appeal hearing officers is comparable to the payment of judges who preside over traditional infraction hearings. As the costs of employing police and judges are not deducted to determine the clear proceeds of a penalty, *ante*, slip op. at 24, —— N.C. App. at ——, —— S.E.2d at —— (citing *Cauble IV's* discussion of enforcement costs versus collection costs), High Point may not deduct its analogous enforcement costs.

High Point also argues that the General Assembly did not intend for the ten percent formula of section 115C-437 to apply in determining the clear proceeds of red light camera penalties. As the City notes, the statute which enables red light cameras in High Point and approximately two dozen other cities does not state that the clear proceeds of the camera program must go to the schools, but the statutes which specifically authorize red light cameras in the City of Concord and in the County of Wake do direct that the clear proceeds of those local programs be paid to the schools. *Contrast* N.C. Gen. Stat. § 160A-300.1 *with* 2001 N.C. Sess. Laws ch. 286, §§ 3, 4, *as amended by* 2003 N.C. Sess. Laws ch. 380, §§ 3, 4. Further, High Point notes that the Concord and Wake County statutes provide a different definition for the phrase "clear proceeds," to wit: "the funds remaining after paying for the lease, lease purchase, or purchase of the traffic control photographic system; paying a contractor for operating the system; and paying any administrative costs incurred by the municipality related to the use of the system." 2001 N.C. Sess. Laws ch. 286, §§ 3, 4, *as amended by* 2003 N.C. Sess. Laws ch. 380, §§ 3, 4.

However, we are unpersuaded that the laws which, by their terms, are limited in applicability to the red light camera programs in Concord and Wake have any bearing on the definition of "clear proceeds" by which High Point is bound. As indicated in section I of our discussion, the clear proceeds of the penalties collected by High Point's red light camera program must be paid to the Guilford County Board of Education. Further, the General Assembly's 2001 enactment concerning Concord and Wake makes it clear that the Legislature feels it has the authority to clarify the meaning of clear proceeds in the context of red light camera programs. As the General Assembly has not made a new definition applicable to High Point, we must conclude that the City is bound by the definition of clear proceeds set forth in section 115C-437 of the General Statutes.

High Point finally argues that, even if applicable, section 115C-437 cannot limit its collection costs to ten percent of the amount of the penalties collected because this limitation runs afoul of the flexible test for determining the costs of collection established by the Supreme Court in *Cauble IV*. The *Cauble IV* decision, which predated the enactment of section 115C-437, affirmed this Court's reversal of a superior court order disallowing Asheville's attempt to withhold penalty collection costs from the local school board. *Cauble IV*, 314 N.C. at 605-06, 336 S.E.2d at 64. In reaching this decision, the Supreme Court held that the Constitution was not so "impractical and

harsh" as to "deny municipalities the reasonable costs of collections." *Id.* at 606, 336 S.E.2d at 64. Read closely and in context, *Cauble IV* stands for the proposition that Article IX, Section 7 allows localities to retain their reasonable collection costs; however, the decision stops far short of declaring a constitutional mandate that local governments receive the entirety of their collection expenses.

Our courts "give[] acts of the General Assembly great deference, and a statute will not be declared unconstitutional under our Constitution unless the Constitution clearly prohibits that statute." *In re Spivey,* 345 N.C. 404, 413, 480 S.E.2d 693, 698 (1997). In conducting such an analysis, our Constitution will be given an interpretation " 'based upon broad and liberal principles designed to ascertain the purpose and scope of its provisions.' " *Moore,* 359 N.C. at 513, 614 S.E.2d at 527 (quoting *Elliott v. State Bd. of Equalization,* 203 N.C. 749, 753, 166 S.E. 918, 920-21 (1932)). Further, "the General Assembly's actions in . . . implement[ing] [Article IX, Section 7] must be held to be constitutional unless the statutory scheme runs counter to the plain language of or the purpose behind Article IX, Section 7." *Id.* at 512, 614 S.E.2d at 527.

As already indicated, the plain language of Article IX, Section 7 states that the clear proceeds of applicable penalties, fines, and forfeitures "shall belong to and remain in the several counties, and shall be faithfully appropriated and used exclusively for maintaining free public schools." This language is unequivocal as to its drafters' intent to benefit the public schools as opposed to city treasuries. We conclude that the statutory limitation on a municipality's ability to withhold collection costs, as codified by section 115C-437 of the General Statutes, comports with the language of Article IX, Section 7. We likewise conclude that *Cauble IV* does not require a contrary result.

Accordingly, the superior court did not err by using section 115C-437 to determine the amount of the clear proceeds earned by High Point's red light camera program. Further, the superior court correctly applied section 115C-437 to determine that High Point must pay ninety percent of the amount collected by its red light camera program to the Guilford County Board of Education. With regard to this issue, the challenged summary judgment must be affirmed.

III. The Applicability of Post-Judgment Interest to the Judgment Against High Point

[3] Section 24-5 of the General Statutes provides that,

SHAVITZ v. CITY OF HIGH POINT

[177 N.C. App. 465 (2006)]

[i]n an action other than contract, any portion of a money judg-
ment designated by the fact finder as compensatory damages
bears interest from the date the action is commenced until the
judgment is satisfied. Any other portion of a money judgment in
an action other than contract, except the costs, bears interest
from the date of entry of judgment . . . until the judgment is sat-
isfied. Interest on an award in an action other than contract shall
be at the legal rate.

N.C. Gen. Stat. § 24-5(b) (2005). This statute does not operate against
the state because "interest may not be awarded against the State
unless the State has manifested its willingness to pay interest by an
Act of the General Assembly or by a lawful contract to do so." *Yancey
v. Highway Commission*, 222 N.C. 106, 109, 22 S.E.2d 256, 259 (1942)
(holding that the predecessor of the Department of Transportation
could not be ordered to pay post-judgment interest because it was an
unincorporated agent of the state). High Point argues that "[b]ecause
[s]ection 24-5 cannot be used to impose interest against the State, and
because counties and cities are political subdivisions of the State, it
follows that [s]ection 24-5 cannot be used to impose interest against
a county or city acting in its sovereign capacity." We agree.

In holding that post-judgment interest cannot run against the
state absent a statutory declaration to the contrary, our Supreme
Court noted that " 'it is a known and firmly established maxim that
general statutes do not bind the sovereign unless expressly men-
tioned in them. Laws are *prima facie* made for the government of the
citizen and not of the State itself.' " *Id.* at 110, 22 S.E.2d at 260. This
maxim has also been applied in favor of the political subdivisions of
the state. *See O'Berry, State Treasurer v. Mecklenburg County*, 198
N.C. 357, 363, 151 S.E. 880, 884 (1930) ("[G]eneral statutes do not bind
the sovereign unless the sovereign is expressly mentioned. . . . [T]he
General Assembly did not intend to include governmental agencies
within the [statutory definition at issue].").

Indeed, the political subdivisions of the state are "exempt . . .
from the running of time limitations unless the pertinent statute
expressly includes the State" so long as the function at issue is
governmental, not proprietary. *Rowan County Bd. of Education
v. U.S. Gypsum Co.*, 332 N.C. 1, 8-9, 418 S.E.2d 648, 653-54 (1992).
"[A]n analysis of the various activities that th[e] Court has held to
be proprietary in nature reveals that they involved a *monetary
charge* of some type," such as providing water and sewer services

SHAVITZ v. CITY OF HIGH POINT

[177 N.C. App. 465 (2006)]

to municipal citizens. *Sides v. Hospital*, 287 N.C. 14, 22, 213 S.E.2d 297, 302 (1975) (citing *Foust v. Durham*, 239 N.C. 306, 79 S.E.2d 519 (1954)). "[A]ll of the activities held to be governmental functions by th[e] Court are those historically performed by the government, and which are not ordinarily engaged in by private corporations," such as the "installation and maintenance of traffic light signals." *Id.* at 23, 213 S.E.2d at 303 (citing *Hamilton v. Hamlet*, 238 N.C. 741, 78 S.E.2d 770 (1953)).

We conclude that the same rule that applies to general statutes of limitation should obtain in the case of general interest statutes. Thus, absent a legislative provision to the contrary, a municipality should not be ordered to pay interest pursuant to a general interest statute where the issue which has been litigated involves a governmental function of the municipality.

In the present case, High Point was sued for enforcing state and municipal traffic laws and for its management of the proceeds collected for violations. These functions were governmental such that, under the foregoing analysis, the general post-judgment interest provisions of section 24-5 of the General Statutes did not apply to any judgment against the City.

Accordingly, the superior court erred by ordering High Point to pay post-judgment interest in this case. The interest portion of the superior court's judgment is vacated.

## Conclusion

The superior court properly ruled that Article IX, Section 7 requires the clear proceeds of High Point's red light camera program to be paid to the Board of Education, and properly determined the amount of the clear proceeds due to the Board. However, the trial court erred by ordering High Point to pay post-judgment interest on the award. Therefore, the challenged judgments are

Affirmed in part; vacated in part.

Judges ELMORE and LEVINSON concur.